**EXHIBIT A**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| GTSI CORP., Plaintiff, v. THE UNITED STATES, Defendant. | ) | Case No. 06-545 C<br>Hon. Lawrence. J. Block |

**AMENDED COMPLAINT**

COMES NOW Plaintiff, GTSI Corp. ("Plaintiff" or "GTSI"), through its undersigned counsel, and alleges as follows for its Amended Complaint against the United States, acting through the Federal Election Commission ("FEC").

**Nature of the Action**

1. This is an action for relief under the Contract Disputes Act of 1978 ("CDA"), codified at 41 U.S.C. §§ 601-613 (West Supp. 2003), and the Tucker Act, codified at 28 U.S.C. § 1491.

2. This action appeals the Contracting Officer's Final Decision issued by the FEC on or about July 7, 2006, which affirmed the termination for cause of GTSI's Contract Number FE-3-AC-0055 and denied GTSI's certified claim.

3. This action also appeals the Contracting Officer's Final Decision issued by the FEC on or about March 22, 2007, which affirmed the termination for cause of GTSI's Contract Number FE-3-AC-0055 and denied GTSI's certified claim.

**EXHIBIT A**

## Jurisdiction and Timeliness

4. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1491.

5. On July 7, 2006, the FEC Contracting Officer issued a Final Decision denying GTSI's certified claim filed March 8, 2006. The original complaint was filed within one year after GTSI's receipt of the Contracting Officer's Final Decision. Therefore, this Amended Complaint is timely filed.

6. On March 22, 2007, the FEC Contracting Officer issued a Final Decision denying GTSI's certified claim filed January 18, 2007. This amended complaint, which appeals the Contracting Officer's March 22, 2007 Final Decision, is filed within one year after days of GTSI's receipt of it. Accordingly, this Amended Complaint is timely filed.

## The Parties

7. Plaintiff GTSI is a Delaware corporation, with its principle place of business in Virginia.

8. Defendant is the United States, acting through the Federal Election Commission.

## Statement of Relevant Facts

9. This appeal arises from events occurring under a contract between GTSI and the FEC for the development and implementation of an automated compliance reporting system.

10. On or about August 15, 2003, the FEC issued RFP No. FE-3-AR-0005 ("the Solicitation"), a competitive procurement for the development of a web-based report review system (the "E-System") for the FEC's Reports Analysis Division ("RAD"). The E-System was intended to automate the FEC's manual report review process and to interface with existing FEC databases so that FEC analysts could determine whether subject political action committees ("PACs") were in compliance with federal election laws and regulations.

**EXHIBIT A**

11. On or about September 30, 2003, the FEC awarded GTSI a contract to develop the E-System, Contract FE-3-AC-0055 (the "Contract").

12. The Contract Statement of Work ("SOW") set out five performance components called modules (the "Modules"), each with its own series of deliverables, including requirements documentation, design documentation, user acceptance testing, and knowledge transfer documentation. The Contract originally set a period of performance from September 2003 to August 6, 2004. However, during Contract performance, the FEC issued eleven (11) modifications to the Contract, ultimately extending the Contract period of performance to March 1, 2006.

13. The Contract stated that funding would be incrementally provided not to exceed four hundred thousand dollars ($ 400,000.00) for the remainder of 2003 and included a period of performance beginning November 2003 and ending December 31, 2004.

14. Immediately after the Contract was executed, the FEC issued Modification 0001, setting forth individual contract line item costs for the five Modules and increasing the total Contract price to one million, one hundred thirty-five thousand, and five hundred sixty dollars ($ 1,135,560.00).

15. On November 5, 2003, GTSI entered into a subcontract agreement with Claraview, Inc. ("Claraview"), under which Claraview would provide software, documentation and services in support of GTSI's Contract with the FEC.

16. GTSI submitted a Project Plan to the FEC setting forth a schedule for the deliverables in all of the Modules. GTSI's Project Plan set forth the estimated amount of time GTSI would require to complete each Module deliverable, based on the expected level of effort for each Module as indicated by the Contract SOW.

**EXHIBIT A**

17. Under the Contract, GTSI was required to submit completed Modules to the FEC in sequential order and GTSI in many cases could not proceed until the FEC conducted its testing and acceptance of submitted deliverables. The deliverables schedule in GTSI's Project Plan was thus based in significant part on the FEC's cooperation and timely performance of its own requirements under the Contract, including primarily the timely testing and acceptance of GTSI's submitted Module deliverables. In addition, pursuant to the Contract, the FEC was responsible for the maintenance and operation of its own information technology ("IT") systems upon which the E-System was to be built, a factor which, if FEC IT systems were not working properly, would negatively affect GTSI's ability to adhere to its Project Plan schedule and meet deliverable deadlines.

**<u>Module 1 – Work Assignment</u>**

18. GTSI began performance of Module 1 deliverables in November 2003.

19. The SOW under Module 1 required GTSI to develop an interface with the FEC disclosure database to both retrieve and update information. GTSI was to create Oracle database tables for future use to migrate data from existing FEC databases to the newly created E-System.

20. Under the SOW, performance of Module 1 did not include extensive support and maintenance of the E-System beyond independent validation and verification and user acceptance testing. Once GTSI delivered the completed Module 1 to the FEC, the FEC was required to install, operate and test the E-System using documentation and knowledge transferred from GTSI.

21. GTSI was required to submit the completed Module 1 to the FEC for testing. The FEC was required to test the GTSI's completed Module and approve it before GTSI could move the Module into production mode.

**EXHIBIT A**

22. After GTSI submitted its completed Module 1 to the FEC for testing, the FEC began experiencing difficulty establishing a workable testing environment to test the completed Module 1 before it went into production. The delays caused by the FEC testing process in turn caused GTSI to run over its deliverables deadlines, since GTSI could not proceed with production of Module 1 and other deliverables until the FEC completed its testing process.

23. Causing further delays in GTSI's deliverables schedule during performance of Module 1, GTSI and the FEC discovered that the FEC IT systems upon which GTSI's E-System was to be built had numerous technological problems that required significant time and effort to resolve.

24. The Contract did not require GTSI to fix any FEC IT systems problems. Nonetheless, GTSI spent a considerable amount of time assisting the FEC in fixing such problems, even though GTSI's efforts to resolve the FEC's IT problems were unrelated to any of GTSI's E-System deliverables.

25. Despite the aforementioned delays and numerous FEC IT systems difficulties, GTSI completed its performance obligations in Module 1 and delivered the completed Module to the FEC.

26. The FEC accepted GTSI's performance and signed off on Module 1 on or about September 30, 2005.

27. After the FEC accepted Module 1 and GTSI moved on to its next set of deliverables on other Modules, the FEC then demanded that GTSI revisit Module 1 to provide extensive additional support of the Module, work that again fell outside the Contract SOW. The additional support services required by the FEC were outside the scope of the Contract and would cause further delays in GTSI's deliverables schedule. Nonetheless, the FEC still insisted

**EXHIBIT A**

that GTSI provide this extra support and refused to issue a modification to the Contract to pay GTSI for its costs incurred from the additional support services for Module 1.

28. In providing the extra support for Module 1 demanded by the FEC, GTSI was forced to reallocate resources it had already dedicated to performance of other Modules back to support Module 1. As a result, the FEC prevented GTSI from meeting some of its scheduled deliverable deadlines for other Modules under the Contract.

**<u>Module 2 – Pre-Review Preparation and Report</u>**

29. During its performance of the Module 1 deliverables, GTSI also began performance of deliverables on other Modules, including Module 2.

30. The process GTSI developed under Module 2 allowed the FEC to generate reports providing detailed information about each filer at the FEC and about the status of communications between the FEC and the PAC. After Module 2 was implemented, information was obtained from the FEC Oracle database and would include the information exported from the FEC's old system.

31. The Contract SOW for Module 2 required GTSI to export information from the FEC's old system to the E-System and to create interfaces with several of the FEC's Oracle databases to allow FEC analysts to generate extensive reports. In addition, GTSI was to develop new tables in the existing FEC Oracle database to allow FEC analysts to enter new data.

32. The SOW under Module 2 did not require GTSI to provide any significant user support or maintenance services of the E-System beyond independent validation and verification, user acceptance testing, and limited support needed to fix minor system glitches.

33. In connection with GTSI's performance of Module 2 requirements, the FEC was to install, operate and test the E-System using documentation and knowledge transferred from

**EXHIBIT A**

GTSI. Once the FEC performed its installation, operation and testing of the E-System, it was to accept Module 2 as complete.

34. While GTSI was performing its Module 2 deliverables, the FEC directed GTSI to add substantial additional features to the E-System not indicated in the requirements set out in the SOW. The FEC's demands for additional features to the E-System during Module 2 performance again consumed significant time and resources that GTSI had planned for other deliverables and consequently pushed back GTSI's scheduled deliverable deadlines for Module 2.

35. In addition, the FEC continued to experience technological difficulties with its own hardware systems, also causing further delays in the FEC's testing and consequently, in GTSI's performance of its deliverables. GTSI again spent time and resources assisting the FEC in resolving its own IT systems problems, even though the problems again were unrelated to any of GTSI's E-System deliverables.

36. Despite the aforementioned delays and technology problems experienced by the FEC, GTSI delivered Module 2 to the FEC, and the FEC formally accepted and signed off on Module 2 on September 30, 2005.

37. After the FEC's acceptance of Module 2, the FEC demanded that GTSI revisit completed Module 2 to provide extensive support services well outside the Contract SOW.

38. In providing unanticipated support services for Module 2, GTSI was again forced to reallocate resources previously dedicated to Modules 3, 4, and 5 to support Module 2. As a result, the FEC prevented GTSI from meeting some of its scheduled deliverables for those Modules under the Contract.

**EXHIBIT A**

**Module 3 – Electronic Report Review**

39. Module 3 would allow the FEC to provide an automated review of committee reports filed with the FEC and would generate a report listing exceptions for the analyst to review to determine whether further action is required. GTSI was required to make the E-System sufficiently flexible to permit changes to threshold exceptions the FEC establishes, without needing to the system to be reprogrammed every election cycle.

40. The Contract SOW for Module 3 states that FEC analysts use approximately 30 checks or standards to review the reports, and that the E-System software would be required to check and analyze each of the 30 standards and the possibly multiple variables within each check to issue a compliance report to the FEC analyst.

41. GTSI began performance on Module 3 by developing requirements documentation for the software that would perform the check and analyze functions. During the development of requirements documentation, the FEC for the first time informed GTSI that the software developed for Module 3 must actually utilize over 800 variables under the aforementioned 30 standards.

42. Until the FEC stated the vast quantity of Module 3 variables to be accounted for in GTSI's software, there was no indication that Module 3 performance would require such a huge effort. The Solicitation, and subsequently the Contract, made only a vague reference to "multiple" variables contained within Module 3 requirements, and certainly never indicated that the FEC would require nearly 800 variables under 30 standards within the Module. Thus, the FEC's Contract failed to adequately describe the specifications the FEC actually required for Module 3.

**EXHIBIT A**

43. Based on the language in the SOW, GTSI had no way of knowing the actual extent of work FEC wanted to be performed relating to the checks and standards integral to Module 3. Moreover, the FEC never indicated during solicitation discussions or the question and answer period that Module 3 would include nearly 800 variables to be checked before a compliance report could be generated.

44. GTSI originally scheduled the requirements and design phase of Module 3 for a two-week delivery deadline. In fact, because of the huge number of variables to be accounted for in the development of Module 3 software, the Module 3 requirements documentation phase alone took several months to complete, causing significant delay again in GTSI's project plan and deliverables schedule and causing GTSI's additional costs to mount.

45. In April 2004, during its performance on Module 3 deliverables, GTSI notified the FEC that the huge number of variables the FEC required under Module 3 was not stated in either the Solicitation or the Contract SOW, and that it was unreasonable for the FEC to require GTSI to account for dozens of variables within each of the 30 standards and still perform the Contract in the time frame specified and for the Contract price.

46. GTSI more formally raised the issue of defective specifications at a project meeting between GTSI and the FEC held on or about May 20, 2004. GTSI informed the FEC that the specifications in the SOW addressing the checks and standards and any variables within the checks and standards was so limited that there was no way GTSI could have reasonably forecast the extent of work the FEC actually wanted.

47. In or around June 2004, GTSI raised again its concerns that the additional variables the FEC then required for Module 3 were outside the scope of the Contract.

**EXHIBIT A**

48. Over the next several months, while continuing to perform deliverables under various Modules, GTSI continuously researched and documented the defective specification issues in Module 3 in order to provide the FEC with a complete picture of how the agency's numerous additional requirements would impact the deliverables and, in particular, their delivery deadlines. GTSI consequently arrived at the conclusion that the defects would not only result in delays in Contract performance but would also significantly increase its cost of performance and communicated this conclusion to the FEC.

49. Significantly, after extensive communication between the FEC and GTSI concerning whether all of the 800 variables were in fact within the scope of the Contract SOW, the FEC conceded that approximately 200 variables were outside the scope. However, despite GTSI's insistence that the FEC was still unreasonable to demand that GTSI's requirements under Module 3 include over 600 variables, the FEC demanded that GTSI agree to perform Module 3 including all 600 of the variables. The FEC further stated that Module 3 could not be completed unless all of the variables were included in GTSI's software requirements, in effect stating that the Contract could not have been performed with the specifications set forth in the Contract SOW.

50. GTSI did not agree that all of the 600 variables were within the Contract SOW, but had no choice but to perform. The FEC's demand that GTSI account for hundreds of variables not identified in the SOW threw the schedule of current and future deliverables further off of the original schedule. Although the FEC issued a modification to the Contract that extended the period of performance for Module 3, a tacit acknowledgement that more time would be required to complete all of the additional work under Module 3, the FEC refused to alter the Contract price to pay GTSI for extra work required under Module 3.

**EXHIBIT A**

**Module 4 – Letter Generation, Response Tracking, and Record Keeping**

51. While still performing on other deliverables for Modules 1, 2, and 3, GTSI began work on the Module 4 deliverables.

52. Module 4 would permit the FEC analyst to create a letter/Request for Additional Information based on filing discrepancies noted from the report Module 3 generates. All exceptions from Module 3 were to be linked to scripted language for the notification Module 4 generates.

53. Under the SOW for Module 4, GTSI was required to track the notice and store its image electronically. GTSI was further required to store the date and text electronically in such a way that the information could be automatically extracted and used to populate fields in the appropriate FEC Oracle database tables and other Modules in the E-System.

54. The extra services demanded by the FEC in connection with Modules 1, 2, and 3 required GTSI to divert resources away from performing its the Module 4 deliverables. Despite such delays, GTSI made progress on its performance of Module 4 and submitted its design and requirements documentation for Module 4 to the FEC on or about June 1, 2004. The FEC did not accept these deliverables until September 8, 2004, a three (3) month delay after submission.

55. After GTSI submitted its Module 4 design and requirements documentation, GTSI had to wait for the FEC's formal feedback on the deliverable. However, GTSI continued to work on Module 4 deliverables to prevent further slippage of the schedule.

56. GTSI was in the process of performing additional deliverable requirements on Module 4 when the FEC issued its stop work order in December 2005.

**EXHIBIT A**

**Module 5 – Management Reports**

57. At the time it was performing work on the deliverables for Modules 1, 2, 3, and 4, GTSI also started to work on some of its Module 5 deliverables.

58. Module 5 would allow the FEC RAD Management to generate a series of reports evaluating the FEC's performance at various levels and the review process for "efficiency/ resource utilization, quality, flexibility, and service."

59. Under the SOW for Module 5, GTSI was required to develop software that would assemble reports from data mined from all the Modules and listed by priority established in Module 1. The FEC required GTSI to design the E-System so that these reports would automatically calculate and measure filer metrics using numerous different identifiers, as well as track reports through the processes.

60. The extra support services the FEC demanded for Modules 1, 2, and 3 required GTSI to divert resources away from its performance on Module 5. Nonetheless, on or about November 1, 2004, GTSI submitted its design and requirements documentation for Module 5 to the FEC. This deliverable was apparently still under review by the FEC over one year later when the FEC issued its stop work order in November 2005.

61. While it waited for the FEC to complete its review of the Module 5 documentation, GTSI continued to work on other Module 5 deliverables to mitigate further delivery schedule slippage. GTSI was making progress on Module 5 deliverables when the FEC stopped all work on the Contract in November 2005.

**GTSI Performs Contract Requirements**

62. Throughout the entire time GTSI performed under the Contract, the FEC and GTSI engaged in continuous discussions regarding the extent of the work the FEC actually

**EXHIBIT A**

required to develop its E-System and automate its manual report review system and whether such extensive work was within the scope of the Contract.

63. The FEC acknowledged that at least some of the E-System requirements fell outside the scope of the Contract; nevertheless, the FEC insisted GTSI perform the work, which GTSI did.

64. Although the Contract did not require GTSI personnel to work on-site at the FEC 100% of the time, where possible, GTSI accommodated the FEC's requests to have specific personnel available on-site. At all times during the Contract's performance, in compliance with Contract requirements, GTSI assigned the appropriate number of personnel to work on and complete the deliverables.

65. On or about March 4, 2005, while GTSI was working on Module 3 deliverables, and addressing the FEC's additional E-System requirements, Cheryl Bell, the GTSI Project Manager ("PM") on the Contract, wrote a letter to the FEC discussing the status of work GTSI performed after the period of performance ended and the schedule delays. PM Bell provided the FEC with a schedule of resources GTSI needed, including additional funding and FEC personnel, from the FEC to complete the project by July 2005 under the latest Contract Modification.

66. In response, the FEC denied GTSI's requests for additional funding and directed GTSI to continue performing the Contract without modification.

67. In April 2005, the FEC issued GTSI a letter in which the agency mentioned for the first time the possibility that it might terminate GTSI's Contract for cause. Upon receiving the letter, GTSI immediately arranged for senior executives from GTSI and Claraview to meet with several FEC staff members to resolve the FEC's stated issues.

**EXHIBIT A**

68. Ultimately, the FEC and GTSI worked out a solution and the FEC asked GTSI to continue with its Contract performance, which GTSI did. On or about August 26, 2005, GTSI received a letter from FEC Deputy Staff Director for Management and Chief Financial Officer Anthony Scardino in which Mr. Scardino stated that the parties were making progress establishing an action plan to resolve many of the challenges encountered during Contract performance.

69. On or about September 7, 2005, the FEC and GTSI met to execute a Remedy Plan to adjust the schedule for deliverables to compensate for the unanticipated challenges encountered in performing the Contract.

70. For each of GTSI's deliverable deadlines, the Remedy Plan stated GTSI's specific assumptions about each deliverable that must be true for GTSI to timely and successfully complete the deliverable. One express assumption was that, for GTSI to meet its deliverable deadlines, the FEC must work with GTSI and perform the FEC's user review and testing obligations.

71. During previous communications between the parties, the FEC had conceded that FEC employees were at times unavailable to perform critical testing and other tasks, a problem that had disrupted the project schedule and caused delays. Accordingly, the FEC agreed in the Remedy Plan to provide additional personnel in the form of at least one dedicated individual to conduct testing of GTSI's submitted deliverables to reduce previous delays in turnaround times between the FEC and GTSI.

72. The Remedy Plan incorporated a secondary plan to account for any deadline slippage if GTSI's stated assumptions about any specific deliverable did not hold true.

**EXHIBIT A**

73. For Modules 1 and 2, the Remedy Plan showed that those Modules were accepted, in production and the FEC had completed its testing.

74. For Module 3, the Remedy Plan established a comprehensive schedule for deliverables with a project completion date set for January 13, 2006, when Module 3 would be moved into production.

75. For Module 4, the Remedy Plan set forth a complete schedule of deliverables with project completion date set for October 7, 2005, when Module 4 would be moved into production. Again, the FEC was required to timely perform testing and review the Module's functionality for GTSI to timely submit its deliverables.

76. For Module 5, the Remedy Plan established a series of deliverable deadlines and a project completion date set for January 13, 2006, contingent upon earlier deadlines, when Module 5 would be moved into production. GTSI would only be able to meet its deliverable deadlines if the FEC was able to timely finish its review and testing of Module 5.

77. The FEC executed the Contract Modification incorporating the Remedy Plan on or about September 29, 2005, extending the Contract period of performance until March 1, 2006.

78. As part of the Remedy Plan, GTSI agreed to provide the FEC with weekly status reports addressing the work completed during the period, the work to be performed in the upcoming week, any problems encountered while performing the work and any reasons for schedule slippage. GTSI met this requirement and provided such status reports to the FEC.

79. The FEC also required that GTSI personnel use the FEC's ClearQuest program, a project management software program, to input and manage all identified issues and solutions encountered when implementing the Remedy Plan. The FEC and GTSI agreed to communicate

**EXHIBIT A**

all performance issues through ClearQuest. GTSI met this requirement and entered all performance issues into the ClearQuest system for the FEC's review and resolution.

80. The FEC did not use ClearQuest as the parties agreed and therefore did not communicate performance issues to GTSI, depriving GTSI of the ability to address any alleged performance issues the FEC had as they arose.

81. During this same time, GTSI continued to make progress on Modules 3, 4, and 5 and submitted several deliverables to the FEC.

82. GTSI continued to provide additional support services to the FEC for Modules 1 and 2 throughout the Contract period of performance, even assisting the FEC at the request of the agency in resolving FEC technical problems wholly unrelated to work GTSI was contracted to perform.

83. The extra support services the FEC demanded for Modules 1 and 2 caused GTSI to incur substantial additional costs. Even so, GTSI continued performing under the Remedy Plan, making progress to resolve outstanding issues related to the Module 3 standards and the other internal deadlines for Modules 4 and 5. Significantly, in an e-mail to GTSI dated October 21, 2005, the FEC admitted that it had contributed to certain delays in GTSI's ability to timely meet its deliverable deadlines.

84. The extensive and numerous Contract Modifications throughout Contract term, eleven in all, demonstrate that the E-System project in reality required a much greater level of effort than either of the parties anticipated prior to Contract award. Nonetheless, GTSI continued to perform, making progress toward Contract completion while incurring significant cost overruns under the Contract.

**EXHIBIT A**

**FEC Improperly Terminates GTSI's Contract for Cause**

85. Notwithstanding GTSI's continued contract performance, on or about December 1, 2005, GTSI received a Stop Work Order from the FEC. GTSI immediately requested a meeting with the FEC to discuss options and was informed by the FEC that, only after GTSI completed the close-out and transition tasks, the FEC and GTSI might be able to meet.

86. When GTSI received the Stop Work Order, GTSI was performing its tasks pursuant to the Remedy Plan and was making progress toward Contract completion.

87. On or about December 2, 2005, GTSI completed its wrap-up tasks related to the Stop Work Order and submitted documents related to the work it was performing on various Contract Modules to the FEC.

88. On or about December 29, 2005, GTSI received a Show Cause Notice from the FEC. Although GTSI had been instructed to cease work pursuant to the FEC's December 1, 2005 Stop Work Order, GTSI remained willing and able to complete its performance obligations under the Contract, a fact that GTSI repeatedly communicated to the FEC.

89. Many of the general issues the FEC listed in its Termination Notice, had not been identified and documented by the FEC in its ClearQuest program pursuant to the Remedy Plan and had not been brought to the attention of GTSI through any other means. The FEC thus deprived GTSI of an opportunity to address the FEC's concerns as they arose during Contract performance. Moreover, the FEC repeatedly refused GTSI's offers to meet to discuss any performance issues and how to resolve them.

90. Notwithstanding GTSI assertions that a termination for cause would not be in the FEC's best interest and assurances that GTSI was able to complete contract performance by the Contract end date on March 1, 2006, the FEC issued GTSI a Notice of Termination for Cause.

**EXHIBIT A**

In the Termination for Cause Notice, the FEC informed GTSI that it intended to reprocure the services to complete the E-System and charge GTSI for all reprocurement costs.

91. When GTSI received the FEC's Show Cause Notice, GTSI had completed approximately 80% of the tasks detailed in GTSI's Project Plan and was awaiting the FEC's approval to finalize the last milestones for its remaining deliverables. At that time, GTSI was on track to complete its Contract performance.

92. At the time the FEC issued its Stop Work Order, the FEC had already accepted Modules 1 and 2. In addition, despite all of the extra requirements the FEC imposed on GTSI under Module 3, GTSI's only outstanding deliverables for Module 3 upon receipt of the Stop Work Order were the test plan and user documentation. Had the FEC permitted to GTSI to continue performance, GTSI would have submitted these deliverables shortly and completed Module 3.

93. At the time of the FEC's Stop Work Order, GTSI was dependant upon the FEC's completion of its Module 4 deliverable review before Module 4 could be completed. If the FEC had completed its review of the Module 4 deliverables GTSI submitted on or about June 1, 2004, GTSI would have been able to timely complete the other Module 4 deliverables.

94. With respect to Module 5, at the time it received the Stop Work Order, GTSI was still awaiting the FEC's approval of Module 5 documentation submitted over a year prior. Had the FEC provided GTSI with a comprehensive response regarding the Module 5 documentation, GTSI would have been able to complete Module 5.

95. At present, the FEC is in possession of all documentation for all Modules.

96. GTSI submitted a certified claim to the FEC on March 8, 2006 requesting the termination for cause of its Contract be converted to a termination for convenience and seeking

**EXHIBIT A**

reimbursement of its termination for convenience costs and for work it performed under the Contract in the amount of four hundred fifteen thousand, seven hundred fifty-three dollars ($ 476,452.77). GTSI requested a final decision by the FEC Contracting Officer and certified its claim.

97. The FEC denied GTSI's claim on or about July 7, 2006, leading to the original Complaint, which appealed this decision.

98. GTSI submitted a second claim to the FEC on January 18, 2007, in which it stated that the FEC failed to give a proper cure notice to it before terminating the Contract for cause. GTSI requested the termination for cause be converted into a termination for convenience and requested a final decision by the FEC Contracting Officer.

99. The FEC denied the second claim on or about March 22, 2007, leading to this Amended Complaint appealing the Contracting Officer's final decision.

**COUNT I**
**<u>FEC Breach of Contract</u>**

100. Plaintiff restates and incorporates herein by reference paragraphs 1 through 95 of this Amended Complaint.

101. Throughout the duration of this project, both the FEC and GTSI agreed to schedule revisions to accommodate delays caused by both parties.

102. The Remedy Plan accepted by both GTSI and the FEC and the executed Contract Modifications constitute the entire Contract under which GTSI was performing services to the FEC when the FEC improperly terminated the Contract.

103. At the time the FEC issued its Stop Work Order, and its subsequent Show Cause Notice, GTSI had adhered to the September 2005 Remedy Plan and was making progress on

**EXHIBIT A**

Modules 3, 4, and 5. Moreover, GTSI was making progress and working towards completion its Contract by April 26, 2006.

104. The FEC's subsequent termination of GTSI's Contract for cause was improper because at no time did GTSI ever provide the FEC with a reasonable basis to conclude that GTSI was unable to complete its performance obligations under the Contract.

105. The FEC Show Cause Notice failed to articulate specific allegations of any uncured breach of the current Contract Modification and Remedy Plan that would support the FEC's termination for cause of GTSI's Contract.

106. The FEC's refusal to provide GTSI with specific allegations warranting a termination for cause and failure to adhere to the revise Contract Modification and Remedy Plan is unreasonable, improper, arbitrary and capricious and is a breach of contract and has caused GTSI significant damages.

**COUNT II**
**FEC Breach of Contract**

107. Plaintiff restates and incorporates herein by reference paragraphs 1 through 106 of this Amended Complaint.

108. Throughout the duration of this project both the FEC and GTSI agreed to schedule revisions to accommodate delays caused by both parties.

109. Furthermore, this project was plagued by miscommunications and misinformation about the work to be performed under the Contract.

110. The FAR governs commercial items contracts and related provisions, including the Contract at issue. Under the FAR, the government is required to request from the contractor adequate assurances of future performance prior to terminating a contract for cause.

**EXHIBIT A**

111. Moreover, the FAR requires a government contracting officer to send a cure notice to the contractor prior to terminating a contract for cause for any reason other than late delivery.

112. The FEC never issued GTSI a cure notice as required by the FAR.

113. On April 25, 2005, the FEC issued GTSI a letter that used the word "cure" but did not request assurances regarding contract performance from GTSI. This letter merely informed GTSI that the FEC was willing to meet with GTSI to discuss a new schedule for the contract deliverables.

114. The FEC and GTSI executed a final contract modification on September 30, 2005 establishing new contract terms and, significantly, a new deadline.

115. The FEC did not send GTSI a cure notice, or even a letter using the word "cure," after the final contract modification was executed before it terminated GTSI's contract for cause.

116. Because a new contract was entered into between GTSI and the FEC on September 30, 2005, the government was required to issue a cure notice for failure to perform under the new contract. The FEC failed to do this.

117. The FEC did not send GTSI a cure notice and the FEC did not request adequate assurance of performance as required under the FAR.

118. At the time the Stop Work Order was issued, GTSI was making progress on the work under the new contract and was working toward completing the Contract.

119. GTSI was entitled to receive a cure notice under the FAR and was entitled to inform the FEC how it could finish the Contract before the FEC terminated the Contract for cause.

**EXHIBIT A**

120. The FEC's decision to terminate GTSI's contract without issuing a cure notice and without receiving information from GTSI regarding how it intended to complete the Contract on time was arbitrary and capricious, improper and unreasonable.

121. Therefore, the FEC failed to comply with the law, and improperly terminated GTSI's contract for cause.

122. In addition, by denying GTSI a chance to provide adequate assurances it could finish the contract on time, the contracting officer deprived the termination decision-making process of its most critical input. The quality of the decision to terminate was therefore flawed and was unreasonable.

123. This failure by the FEC is a breach of the Contract and has significantly harmed GTSI.

**Prayer for Relief**

WHEREFORE based on the foregoing, GTSI respectfully requests that the Court:

a. Grant GTSI's appeal of the FEC's termination for cause of the Contract;

b. Convert the termination for default of GTSI's Contract into a termination for convenience;

c. Award to GTSI $ 476,452.77, for work it performed under the Contract;

d. Award GTSI its costs, fees and interest; and

**EXHIBIT A**

e. Award GTSI all other relief that the Court deems just and proper.

Respectfully submitted,

____________________________

Seth C. Berenzweig, Esq.
ALBO & OBLON, LLP
2200 Clarendon Boulevard
Suite 1201
Arlington, Virginia 22201
Telephone: (703) 312-0410
Facsimile: (703) 312-0415

*Counsel for GTSI Corp.*

Dated: March 30, 2007